Patrice L. Bishop (182256)
pbishop@ssbla.com
**STULL, STULL & BRODY**
9430 W. Olympic Blvd., Suite 400
Beverly Hills, CA 90212
Tel: 310-209-2468
Fax: 310-209-2087

*Counsel for Plaintiff Ted Ingber*

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED INGBER, on behalf of himself and all others similarly situated, | Case No. 3:19-cv-5938 |
| Plaintiff, | <u>**CLASS ACTION**</u> |
| v. | **COMPLAINT** |
| HEADWAY TECHNOLOGIES, INC., HUTCHINSON TECHNOLOGY INC., MAGNECOMP PRECISION TECHNOLOGY PUBLIC CO. LTD., NAT PERIPHERAL (DONG GUAN) CO., LTD., NAT PERIPHERAL (H.K.) CO. LTD., NHK SPRING CO. LTD., NHK INTERNATIONAL CORPORATION, NHK SPRING (THAILAND) CO., LTD., SAE MAGNETICS (H.K.) LTD., AND TDK CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ted Ingber, individually and on behalf of the Class described below, brings this class action against Defendants Headway Technologies, Inc., Hutchinson Technology Inc., Magnecomp Precision Technology Public Co. Ltd., Nat Peripheral (Dong Guan) Co., Ltd., Nat Peripheral (H.K.) Co. Ltd., NHK Spring Co. Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., SAE Magnetics (H.K.) Ltd., and TDK Corporation (together "Defendants") for damages and injunctive relief pursuant to federal antitrust laws, state antitrust laws, unfair competition, and consumer protection laws. Plaintiff's claims arise from Defendants' unlawful agreement to eliminate competition, fix prices, and allocate markets for hard disk drive suspension assemblies ("HDD Suspension Assemblies") sold in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      Plaintiff brings this antitrust class action on behalf of individuals and entities that indirectly purchased HDD Suspension Assemblies in the United States from Defendants, their predecessors, any subsidiaries or affiliates thereof, or any of their named and unnamed co-conspirators, during the period beginning at least as early as May 2008 until such time as the anticompetitive effects of the Defendants' conduct on United States consumers of such products ceased (the "Class Period").

2.      HDD Suspension Assemblies are a critical component of hard disk drives, which are used to store electronic information. In announcing a guilty plea by Defendant NHK Spring Co., Ltd., Assistant Attorney General Makan Delrahim of the U.S. Department of Justice's (the "DOJ") Antitrust Division said HDD Suspension Assemblies are "critical to the operation and performance of electronic devices, and their impact on American consumers and business is direct and substantial."

3.      HDDs are either incorporated into electronic devices, such as desktop computers, laptops, gaming consoles, and MP3 players, or sold as stand-alone storage devices. An HDD uses a magnetic recording head to read from and write onto the spinning disk contained in the hard

drive. An HDD Suspension Assembly is an electro-mechanical component that holds a disk drive's recording head at a microscopic distance above the drive's disks.

4.    As further detailed below, from at least May 2008 through at least April 2016, Defendants entered into agreements with each other to refrain from price competition and allocate their respective market shares for suspension assemblies used in HDDs. Pursuant to their agreements not to compete, Defendants exchanged pricing information including anticipated pricing quotes, which they used to inform their negotiations with U.S. and foreign customers that purchased suspension assemblies and produced HDDs for sale in, or delivery to, the U.S. and elsewhere. As a proximate result of these agreements, Defendants charged artificially high prices for HDD Suspension Assemblies.

5.    Competition authorities in the U.S. and across the globe have been investigating Defendants' conspiracy since at least 2016.

6.    In as early as July 2016, DOJ opened an investigation relating to HDD Suspension Assemblies. NHK Spring disclosed later that on July 26, 2016, DOJ performed an on-sight inspection of an NHK company.

7.    In July 2019, DOJ filed a one-count information against NHK Spring Co. Ltd, charging the company with fixing prices on HDD Suspension Assemblies. NHK Spring has agreed to plead guilty and pay a $28.5 million criminal fine.

8.    In 2016, the Japanese Fair Trade Commission (the "JFTC") also raided Defendants NHK Spring and TDK on suspicion that the companies were colluding in the supply of HDD components, including HDD Suspension Assemblies. In 2018, NHK Spring and one of its subsidiaries were fined 1.1 billion yen (nearly $10 million) for price fixing HDD Suspension Assemblies. South Korean and Brazilian competition authorities have also been investigating the cartel.

9.    The conspiracy engaged in by Defendants and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of federal antitrust laws, state antitrust laws, unfair competition, and consumer protection laws. As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and members of the Class paid

artificially inflated prices for HDD Suspension Assemblies and have been injured in their business and property for the period beginning at least as early as May 2008 and continuing until at least April 2016.

### JURISDICTION AND VENUE

10.     This Court's jurisdiction over the subject matter of this action is proper pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.   Likewise, this Court's jurisdiction over the subject matter of the state law claims is proper pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

11.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) directly or indirectly sold or marketed substantial quantities of HDD Suspension Assemblies throughout the United States as a whole, including in this District; (b) had substantial aggregate contacts with the United States, including in this District; (c) transacted business in the United States, including in this District; or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

12.     Because a substantial part of the events giving rise to Plaintiff's claim occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District, venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d).

13.     HDD Suspension Assemblies manufactured abroad by Defendants and sold for use in products in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any HDD Suspension Assemblies are purchased in the United States, and such HDD suspension assemblies do not constitute import commerce, Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

## PARTIES

**A.     Plaintiff**

14.     Plaintiff Ted Ingber is a resident of Parkland, FL.  During the Class Period, Plaintiff Ted Ingber purchased HDD Suspension Assemblies indirectly from at least one Defendant. The product was delivered to him in Florida. Plaintiff Ingber was injured in his property as a result of Defendants' unlawful conduct alleged herein.

**B.     Defendants**

*NHK Defendants*

15.     Defendant NHK Spring Co. Ltd. ("NHK Spring") is a Japanese corporation with its principal place of business at 3-10 Fukuura, Kanazawa-ku, Yokohama, 236-0004. During the Class Period, NHK Spring manufactured and/or supplied HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

16.     NHK International Corporation ("NHK International") is a U.S. subsidiary of NHK Spring and maintains its principal place of business at 46855 Magellan Drive Novi, Michigan 48377. During the Class Period, NHK Spring supplied, serviced, and/or sold HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

17.     NHK Spring (Thailand) Co., Ltd. ("NHK Thailand") is a Thailand-based subsidiary of NHK Spring with its principal place of business located at Bangna Tower A, 6th-7th floor 2/3 Moo 14, Bangna-Trad Rd., (km. 6.5), Bangkaew, Bangplee, Samutprakarn 10540 Thailand.

During the Class Period, NHK Thailand manufactured and/or supplied HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

18.    Defendant NAT Peripheral (Dong Guan) Co., Ltd. ("NAT Dong Guan") is a China-based subsidiary of NHK Spring, with its principal place of business located at Conrad Hi-Tech Park, Shangsha, ZhenAn Road, ChangAn Town, Dongguan, Guangdong, 523830 China. During the Class Period, NAT Dong Guan manufactured and/or supplied HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

19.    Defendant NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") is a China-based subsidiary wholly owned by NHK Spring, with its principal place of business located at Suite 15b-17, 9/F, Tower 3, China Hong Kong City, 33 Canton Rd., T.S.T., Kowloon, Hong Kong. During the Class Period, NAT H.K. manufactured and/or supplied HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

***TDK Defendants***

20.    Defendant TDK Corporation ("TDK") is a Japanese corporation with its principal place of business located at 2-5-1 Nihonbashi, Chuo-ku, Tokyo, 103-6128, Japan. TDK has a California-based branch located at 1745 Technology Drive, Suite 200, San Jose, CA 95110. During the Class Period, TDK manufactured, marketed and/or sold HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

21.    Defendant Magnecomp Precision Technology Public Co. Ltd. ("MPT") is a Thailand-based subsidiary of TDK, with its principal place of business located at 162 M.5 Phaholyothin Road, T.Lamsai A.Wangnoi, Ayutthaya 13170, Thailand. During the Class Period, MPT manufactured, marketed and/or sold HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

22.    Defendant SAE Magnetics (H.K.) Ltd. ("SAE Magnetics") is a China-based subsidiary wholly owned by TDK, with its principal place of business located at 6 Science Park East Avenue, Hong Kong Science Park, Hong Kong, China. During the Class Period, SAE

Magnetics manufactured and/or supplied HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

23.    Defendant Hutchinson Technology Inc. ("Hutchinson") is a Minnesota corporation with its principal place of business located at 40 West Highland Park Drive NE, Hutchinson, Minnesota 55350. TDK acquired Hutchinson on October 6, 2016.[1] During the Class Period, Hutchinson manufactured, marketed and/or sold HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

24.    Defendant Headway Technologies, Inc. ("Headway") is a Delaware corporation wholly owned by TDK, with its principal place of business located at 682 South Hillview Drive, Milpitas, California 95035. Headway provides recording head products to the HDD industry and employs approximately 800 people in engineering, manufacturing and administration roles in Milpitas, California. During the Class Period, Headway manufactured and/or supplied HDD Suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

## AGENTS AND CO-CONSPIRATORS

25.    Defendants' anticompetitive and unlawful acts were authorized, ordered, or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' business or affairs.

26.    Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged in this Complaint and may have performed acts and made statements in furtherance of such violations.

27.    Each Defendant acted as the principal, agent or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged in this Complaint.

---

[1] TDK Corporation Announces Completion of Hutchinson Acquisition, TDK Global (Oct. 6, 2016), available at https://www.tdk.com/corp/en/news_center/press/201610062540.htm; TDK 2016 Annual Report, at 46, available at http://www.annualreports.com/HostedData/AnnualReportArchive/t/OTC_TTDKY_2016.pdf.

COMPLAINT                                                    CASE NO. 3:19-cv-5938

28.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint were consensually formed between the Defendant principals and agents. Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals. Defendants' agents acted under the explicit, implied, or apparent authority of their principals. These acts include subsidiaries selling, distributing, or shipping HDD suspension assemblies at the request of their parent companies. Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals. Defendants' agents performed their duties within the scope of their agency, in selling, distributing, or shipping HDD suspension assemblies that were sold at supracompetitive prices.

29.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

## FACTUAL ALLEGATIONS

**A.     HDDs and Suspension Assemblies**

30.     An HDD is a storage device for digital content and information. HDDs can be stand-alone external storage devices or fully integrated into another piece of hardware, such as a desktop or laptop computer. HDDs store documents, pictures, music, videos, programs or applications, operating systems, as well as other digital content. Many electronic devices require an HDD to function. Due to their widespread use, the market for HDDs is large. During the Class Period, over four billion HDDs were shipped worldwide.[2]

31.     An HDD consists of one or more disk platters positioned around a motor-driven spindle hub that rotates the disks. Each disk has data recorded electromagnetically in concentric

[2] *See* Worldwide Unit Shipments of Hard Disk Drives (HDD) from 1976 to 2022, available at https://www.statista.com/statistics/398951/global-shipment-figures-for-hard-disk-drives/; Market Views: Hard Drive Shipments Drop by Nearly 17% in 2015, AnandTech (Mar. 2, 2016), available at https://www.anandtech.com/show/10098/market-views-2015-hard-drive-shipments; Seagate and Western Digital Led the HDD Market Last Year, Market Realist (Jun. 29, 2017), available at https://marketrealist.com/2017/06/seagate-and-western-digital-led-the-hdd-marketlast-year/.

circles, or tracks, on the disk. A magnetic head, similar to a phonograph arm but in a relatively fixed position, reads or writes the information on the tracks. Two heads, one on each side of a disk, read or write the data as the disk spins.

32.     Suspension assemblies hold the recording heads in close proximity to the disks and provide the electrical connection from the recording heads to the hard disk drives' circuitry.[3] Suspension assemblies are a critical component to position the magnetic read/write head above the data on the surface of the spinning disks in the HDD. The distance between the read/write head and the disk platter is referred to as "flying height." The accuracy of this positioning over the tracks on the disk is a large determinant of areal density and subsequently each disk's data capacity. A modern disk drive's flight height is smaller than the circuit size of today's most modern microprocessors. The suspension has a built-in actuator that is controlled to hold the head within a very small tolerance of the centerline of the data track.[4] The suspension assembly consists of three main components that are welded to each other: a base plate, a load beam, and a flexure.

33.     Manufacturers and suppliers of HDD Suspension Assemblies sell them directly to HDD manufacturers, which in turn sell HDDs containing the HDD Suppression Assemblies to manufacturers of products that include HDDs or to consumers.

**B.    Unlawful Price-Fixing Conspiracy and Market Allocation Agreement**

34.     From at least as early as May 2008 and continuing until at least April 2016, Defendants knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by fixing prices for HDD Suspension Assemblies sold in the United States and elsewhere.

35.     To carry out their conspiracy, Defendants engaged in a variety of unlawful activities. At times, Defendants engaged in discussions and attended meetings during which they reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assembles to be sold in the U.S. and globally.

---

[3] Core Business – Suspension Assemblies, available at https://www.magnecomp.com/Home/Core.
[4] What Is A Suspension Assembly?, available at http://www.magnecomp.com/Education/edu?view=01.

36.    Defendants also exchanged HDD Suspension Assemblies pricing information, including anticipated pricing quotes. Defendants used the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD Suspension Assemblies and produced hard disk drives for sale in, or delivery to, the United States and elsewhere.

37.    The conspiracy engaged in by Defendants was a *per se* unlawful restraint of trade and commerce in violation of various state antitrust laws.

### 1.    DOJ and JFTC Investigations

38.    On July 26, 2016, the JFTC raided the offices of TDK Corp. on suspicion that the company was in violation of antitrust laws. That same day, the JFTC and the DOJ also conducted on-site inspections of NHK Spring and NHK International based on the same suspicions:

> On July 26, 2016, [NHK Spring] and NHK International Corporation, a consolidated subsidiary in the United States, underwent an on-site inspection by the Japan Fair Trade Commission and the United States Department of Justice on suspicion of violating the Antimonopoly Act of Japan and the Antitrust Law of the United States concerning trading of hard disk drive devices.[5]

39.    On February 9, 2018, the JFTC issued a cease and desist order and fined NHK Spring and NAT Hong Kong 1.1 billion yen (nearly $10 million) for price-fixing HDD Suspension Assemblies. TDK Corp. and its subsidiaries avoided any financial penalty by applying for leniency and cooperating with the Japanese regulators. TDK Corp.'s application for leniency, pursuant to the applicable statute, indicates an admission by TDK Corp. that it, in fact, engaged in the conduct it was accused of committing.

40.    On July 29, 2019, the DOJ filed a one-count information against NHK Spring Co. Ltd, charging the company with fixing prices on HDD Suspension Assemblies. According to the information, NHK Spring and its co-conspirators did the following for the purpose of forming and carrying out their conspiracy:

---

[5] https://www.nhkspg.co.jp/eng/ir/pdf/Annual%20Report%202018.pdf

COMPLAINT                                                             CASE NO. 3:19-cv-5938

(a)     engaging in discussions and attending meetings during which they reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for HDD suspension assembles to be sold in the United States and elsewhere;

(b)     exchanging pricing information for HDD suspension assemblies, including anticipated pricing quotes in the United States and elsewhere;

(c)     relying on their agreements not to compete and using the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies and produced hard disk drives for sale in, or delivery to, the United States and elsewhere;

(d)     selling HDD suspension assemblies in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices; and

(e)     accepting payment for HDD suspension assemblies sold in, or for delivery to, the United States and elsewhere at collusive and noncompetitive prices.

41.     NHK Spring has agreed to plead guilty and pay a $28.5 million criminal fine and to cooperate in the ongoing investigation.

### 2.     Additional Government Investigations

42.     In January 2018, it was reported that South Korea's antitrust regulator, KFTC, was investigating suspected collusion by manufacturers of HDD suspension assemblies.

43.     In April 2018, Brazil's antitrust regulator, the Administrative Council for Economic Defense ("CADE"), revealed that it was also investigating Defendants' conspiracy. CADE indicated that anticompetitive practices were conducted by at least 38 individuals and were implemented through meetings and e-mail exchanges.

### C.     The Structure and Characteristics of the HDD Suspension Assemblies Market Render the Conspiracy Plausible

44.     The structure and characteristics of the HDD Suspension Assemblies market in the United States are conducive to a price-fixing agreement. Specifically, the HDD Suspension

Assemblies market: (1) is highly concentrated; (2) maintains close business relationships; (3) has high barriers to entry; (4) are commodity products; and (5) has declining demand.

**1.    The HDD Suspension Assemblies Market is Highly Concentrated**

45.    A concentrated market is more susceptible to effective collusion and other anticompetitive practices. The HDD Suspension Assembly industry was highly concentrated during the Class Period.

46.    The demand for HDD Suspension Assemblies depends on the demand for HDDs, which in turn is driven by demand for storage, primarily generated by increasingly complex software.

47.    Beginning in the 1980s, HDDs were incorporated into computers as well as a large section of consumer electronics appliances, such as digital video recorders, MP3 players, digital cameras, and mobile phones.

48.    In the 1980s, there were more than 20 producers of HDD Suspension Assemblies. But by 2005, there were fewer than five major producers left in the market.

49.    In the mid-1990s, Hutchinson became the main producer of HDD Suspension Assemblies, holding a 70% market share and generating approximately $450 million per year in revenue.

50.    In 2003, Defendants SAE and NHK Spring entered into a joint venture to form NAT Hong Kong. NAT Hong Kong engages in the manufacture of HDD Suspension Assemblies. The joint venture was terminated in April 2015, and SAE's share in NAT Hong Kong was transferred to NHK Spring.

51.    By 2005, three companies—Hutchinson, NHK Spring, and MPT—collectively controlled approximately 94% of the global HDD suspension assembly market. Hutchinson held a 55% market share, NHK Spring held a 22% market share, and MPT held a 20% market share.

52.    In 2007, TDK Corp. announced its acquisition of a majority share of MPT. Following this acquisition, Defendant TDK Corp. began producing HDD Suspension Assemblies.

53.     By 2012, Defendants TDK Corp., NHK Spring, and Hutchinson collectively controlled 96% of the global market.[6]

54.     In November 2015, TDK Corp. announced its acquisition of Hutchinson. The acquisition was completed in October 2016. Following the acquisition, TDK Corp.'s market share grew to 55-60% market share, and TDK Corp. noted that NHK Spring was its only competitor in the global market for HDD Suspension Assemblies.[7]

**2.     Defendants Maintained Close Business Relationships**

55.     Business relations among Defendants blurred the lines of competition, accustomed them to working in combination, and provided ample opportunity to collude.

56.     TDK, through its wholly-owned subsidiary SAE Magnetics, and NHK Spring maintained a joint venture to manufacture HDD Suspension Assemblies until March 2015.

57.     SAE Magnetics, in addition, was one of Hutchinson's top three customers throughout the Class Period.

58.     Defendants also cross-licensed each others' suspension assemblies and related technology throughout the Class Period.

59.     Furthermore, Defendants are geographically centralized, making collusion easy to accomplish.

**3.     The HDD Suspension Assemblies Market Has High Barriers to Entry**

60.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

61.     There are substantial barriers that preclude, reduce, or make more difficult entry into the HDD Suspension Assemblies market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million-dollar costs associated with manufacturing

---

[6] Dr. R. Castellano, The Dynamics of the HDD Industry and Its Impact on CMP, at 9, available at https://nccavs-usergroups.avs.org/wpcontent/uploads/CMPUG2012/CMP2012_9castellano.pdf.

[7] https://www.tdk.com/ir/ir_library/annual/pdf/2017_all.pdf

plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships. As Defendant Hutchinson conceded, "we believe that the number of entities that have the technical capability and capacity for producing precision suspension assemblies or components in large volumes will remain small."[8]

62.    Collectively, Defendants also own the majority of patents for HDD Suspension Assemblies. These patents potentially place a significant and costly burden on potential new entrants, which must avoid infringing on the patents when entering the market with a new product.

**4.    HDD Suspension Assemblies Are Commodity Products**

63.    In economics, a commodity is a basic good used in commerce that is interchangeable with other commodities of the same type. Commodities are most often used as inputs in the production of other goods or services. Product homogeneity facilitates collusion more than product differentiation. Homogenous products simplify the process among competitors of arriving at agreements on prices to charge and facilitate monitoring of those agreements.

64.    Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service. This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

65.    HDD Suspension Assemblies are homogenous and commodity-like by nature. Their characteristics and qualities are essentially uniform across different manufacturers. Although different sub-types of HDD suspension assemblies are not interchangeable, within each category the assemblies are designed to be interchangeable.

66.    The homogenization of HDD suspension assemblies is aided by industry-standard product specifications. The principal dimensions of product differentiation in HDD suspension assemblies are well known and easily quantifiable.

---

[8] Hutchinson Technology Inc. 2008 Form 10-K, at 6 and 2015 Form 10-K, at 4.

67.    As HDD Suspension Assemblies are commodities, price is the most obvious differentiation among them for purchasers. In a market of this nature, with tens of millions of components being manufactured and sold a year at relatively inexpensive individual prices, there is a considerable incentive to fix, stabilize, maintain and raise the prices of the components to supracompetitive levels through illegal conspiratorial agreements. By foregoing competition, each manufacturer could still guarantee itself massive profits in such a high-volume market. This anticompetitive conspiracy causes substantial harm to purchasers, to competition, and to U.S. commerce.

**5.    Declining Demand for HDD Suspension Assemblies Motivated Defendants to Protect Their Profits by Fixing Prices**

68.    Declining demand generally creates an incentive for firms to collude because in a competitive market, prices fall when demand falls, and lower prices reduce profits unless manufacturers can cut costs.

69.    Demand for HDD products declined over the course of the Class Period as end-purchasers increasingly opted for forms of data storage technology other than HDDs. Solid state storage and flash memory technology, among other technologies, provided alternatives to consumers and businesses in need of electronic storage.

70.    The demand for HDD Suspension Assemblies is correlated with the demand for HDDs because the former are necessary product components of the latter. Thus, as demand for HDDs fell during the Class Period, so did demand for HDD Suspension Assemblies. That trend, in turn, put downward pressure on HDD suspension assembly prices, threatening Defendants' already slim profit margins for these products. Defendants, therefore, had a strong motive to collude to avoid competition and prop up prices through horizontal coordination.

71.    To mitigate price erosion and counteract a decrease in profitability due to falling demand for HDD Suspension Assemblies, Defendants agreed to refrain from competing on price and to divide the market among themselves.

**TRADE AND COMMERCE**

72.    Defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining and injuring competition by protecting HDD Suspension Assemblies from competition and has direct, substantial, and reasonably foreseeable effect upon interstate and import commerce.

73.    During the Class Period, the business activities of Defendants occurred within the flow of, and substantially affected, interstate trade and commerce. During the Class Period, Defendants' manufacture and sale of HDD Suspension Assemblies occurred in a continuous and uninterrupted flow of interstate and import trade and commerce.

74.    Defendants manufactured HDD Suspension Assemblies outside the United States that were sold in, or for delivery to, the United States. Defendants also sold foreign-manufactured HDD Suspension Assemblies outside the U.S. for incorporation into products—namely HDDs—that were sold in, or for delivery to, the United States. During the Class Period, HDD Suspension Assemblies and HDDs incorporating affected HDD Suspension Assemblies traveled in, and substantially affected, interstate and import trade and commerce.

**ANTITRUST INJURY**

75.    As a direct, proximate, and reasonably foreseeable result of Defendants' conduct, the following effects, among others, occurred:

(a)    Price competition has been restrained or eliminated with respect to HDD Suspension Assemblies;

(b)    The prices of HDD Suspension Assemblies have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of HDD Suspension Assemblies have been deprived of free and open competition; and

(d)    Indirect purchasers of HDD Suspension Assemblies, including Plaintiff, paid artificially inflated prices.

76.    By reason of Defendants' antitrust violations, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for HDD Suspension Assemblies

than they would have paid in the absence Defendants' illegal contract, combination, or conspiracy, and have consequently suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

77.    The markets for HDDs and HDD Suspension Assemblies are inextricably linked because the market for HDD Suspension Assemblies exists to serve the HDD market.

78.    HDD Suspension Assemblies are identifiable and discrete physical products that are unchanged when incorporated into an HDD. HDD Suspension Assemblies followed a traceable, physical chain of distribution from the Defendants to Plaintiff and Class members, and costs attributable to HDD Suspension Assemblies can be traced through the chain of distribution to Plaintiff and Class members.

79.    Likewise, the prices of HDD Suspension Assemblies can be traced down the distribution chain to show that changes in the prices paid by direct purchasers of HDD Suspension Assemblies affected the prices paid by indirect purchasers for HDDs containing HDD Suspension Assemblies.

80.    Unlawful overcharges for a component normally result in higher prices for products containing that component. In this case, the unlawful overcharges for HDD Suspension Assemblies caused by Defendants' conspiracy were passed through to, and raised the prices paid by, end-purchasers of finished goods containing HDD Suspension Assemblies.

81.    Defendants' conspiratorial conduct aimed to raise, fix, maintain or stabilize the price of HDD Suspension Assemblies and, as a direct and foreseeable result, the price of products containing those components.

82.    The precise amount of the overcharge affecting the prices of products containing HDD Suspension Assemblies can be measured and quantified through standard econometric techniques, such as regression analysis, as applied to transactional data.

83.    Defendants' conspiratorial conduct aimed to raise, fix, maintain or stabilize the price of HDD Suspension Assemblies and, as a direct and foreseeable result, the price of products containing those components.

# TOLLING OF THE STATUTE OF LIMITATIONS

**A.    The Statute of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover His Claim**

84.    Plaintiff and the members of the Class had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims as a U.S. consumer set forth herein, until the public announcement of NHK Spring's agreement to plead guilty to the DOJ on July 29, 2019.

85.    Plaintiff and the members of the Class purchased products containing HDD Suspension Assemblies manufactured and produced by Defendants. They had no direct contact or interaction with any Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the DOJ's announcement of NHK Spring's agreement to plead guilty on July 29, 2019.

86.    No information in the public domain was available to Plaintiff and members of the Class prior to NHK Spring's agreement to plead guilty to the DOJ on July 29, 2019, that revealed sufficient information to suggest that any one of Defendants was involved in a criminal conspiracy to eliminate competition and fix prices for HDD Suspension Assemblies in the U.S. market. Plaintiff and the members of the Class had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with their direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

87.    For these reasons, the statute of limitations as to Plaintiff's and members of the Class's claims did not begin to run, and has been tolled with respect to the claims that Plaintiff and the members of the Class have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statute of Limitations**

88.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class. Plaintiff and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of NHK Spring's agreement to plead guilty to DOJ on July 29, 2019.

89.     Because Defendants' agreements, understandings and conspiracies were kept secret until July 29, 2019, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for HDD suspension assemblies throughout the United States during the Class Period.

90.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

91.     By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. HDD Suspension Assemblies are not exempt from antitrust regulation, and thus, before July 29, 2019, Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' HDD Suspension Assembly prices before July 29, 2019.

92.     Plaintiff and the members of the Class could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

93.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 29, 2019, when DOJ announced NHK Spring's agreement to plead guilty.

94.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

**C.     Defendants' Actions Are a Continuing Violation**

95.    In the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Plaintiff and members of the Class are entitled to recover damages they suffered during the limitations period.

96.    A cause of action accrued for Plaintiff and members of the Class each time Plaintiff or members of the Class purchased an HDD Suspension Assembly sold at a price artificially inflated by Defendants' unlawful agreement.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this action on behalf of himself and as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable relief on behalf of the following Class:

> All persons and entities who, during the Class Period, indirectly purchased in the United States a product not for resale which included one or more HDD Suspension Assemblies that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

98.    Plaintiff also brings this action on behalf of himself and as a class action pursuant to Rules 23(a) and (b)(3) on behalf of the following Subclass (the "Repealer State Subclass"):

> All persons and entities who, during the Class Period, indirectly purchased in the Repealer States a product not for resale which included one or more HDD Suspension Assemblies that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

99.    The Repealer States consist of the following jurisdictions, which, as of the date of this filing, expressly permit indirect purchasers to pursue damages based on violations of state antitrust and/or unfair competition law: Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

100.    The following persons and entities are excluded from the above-described proposed Class:

(a)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)    All governmental entities;

(c)    All persons or entities who indirectly purchased HDD Suspension Assemblies for purposes of resale or directly from Defendants or their affiliates;

(d)    The Court, Court personnel, and any member of their immediate families.

101.    The Class Period is initially defined as the period between May 1, 2008, and April 30, 2016.

102.    The Class is so numerous that joinder of all members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiff believes that the members of the Class are geographically dispersed throughout the United States, and that joinder of all Class members would be impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are, at least, thousands of members of the Class widely dispersed throughout the United States.

103.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for HDD Suspension Assemblies and were deprived of the benefits of competition.

104.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Class.

105.    Plaintiff is represented by counsel with experience in the prosecution of complex class action antitrust litigation.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of HDD Suspension Assemblies sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law;

(e)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and members of the Class, thereby entitling Plaintiff and members of the Class to disgorgement of all benefits derived by Defendants;

(f)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and members of the Class;

(g)    The effect of the alleged conspiracy on the prices of HDD Suspension Assemblies sold in the United States during the Class Period;

(h)    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and members of the Class; and

(i)    The appropriate class-wide measure of damages for the Class.

107.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

108.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**Violations of the Sherman Act**
**15 U.S.C. § 1**

109.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

110.   Plaintiff brings this claim against all Defendants on behalf of the Class under federal law.

111.   Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.   Beginning as early as 2008 and continuing through the present, the exact starting date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition in the United States.

113.   In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the prices of HDD Suspension Assemblies.

114.   As a result of Defendants' unlawful conduct, prices for HDD Suspension Assemblies were raised, fixed, maintained, and stabilized in the United States.

115.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants.

116.   For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)   exchanging information on prices charged for HDD Suspension Assemblies;

(b)    agreeing to raise, fix, and maintain prices for HDD Suspension Assemblies;

(c)    raising, fixing, and maintaining prices for HDD Suspension Assemblies;

(d)    submitting rigged bids for HDD Suspension Assemblies;

(e)    allocation markets and/or customers for HDD Suspension Assemblies; and

(f)    selling HDD Suspension Assemblies into and throughout the U.S. at supracompetitive prices.

117.    As a result of Defendants' unlawful conduct, Plaintiff and Class members have been injured in their businesses and property in that they have paid more for HDD Suspension Assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct.

118.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

119.    These violations are continuing and will continue unless enjoined by this Court.

120.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and Class members seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violations of the Cartwright Act
### Cal. Bus. & Prof. Code § 16720 *et seq.*

121.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

122.    Plaintiff brings this claim against all Defendants on behalf of the Class, or alternatively the Repealer State Subclass, under California law.

123.    A significant portion of Defendants' unlawful conduct was carried out in and aimed at California. Defendants engaged in conspiratorial acts and communications within California, including at Defendant Headway's offices in Milpitas and at TDK's division in San Jose. Further, the two dominant U.S. sellers of HDDs, Seagate Technology LLC ("Seagate") and Western Digital Corporation ("Western Digital"), are headquartered in California and within this District. Seagate maintains its principal place of business in Cupertino, California, and Western Digital maintains its principal place of business in San Jose, California. Due in part to these dominant

COMPLAINT                            CASE NO. 3:19-cv-5938

downstream firms' locations within California, as well as California's status as the most populous state, Defendants' marketing and sale of HDD suspension assemblies targeted California more than any state.

124.    Application of California law to all U.S. purchases of finished goods containing HDD Suspension Assemblies manufactured or sold by a Defendant, or any current or former subsidiary of a Defendant, during the Class Period comports with the Due Process Clause given the significant aggregation of contacts between Defendants' illegal conspiracy and California. All Defendants carried out conspiracy-related conduct in California and this conduct caused harm to California residents.

125.    A choice-of-law analysis also favors applying California antitrust law to return damages to all U.S. indirect purchasers of HDD Suspension Assemblies manufactured or sold by a Defendant or any current or former subsidiary of a Defendant. California's interest in punishing antitrust violations occurring in California substantially outweighs any interest of any other state in denying recovery to its residents injured by out-of-state Defendants or applying its laws to conduct occurring outside its borders. No Defendant is a resident of a non-Repealer State, and no state has an interest in preventing indirect purchasers within its borders from recovering from Defendants.

126.    California law should therefore apply nationwide. Alternatively, California law should apply to the claims of all purchasers in the Repealer States.

127.    Defendants' conduct violates the Cartwright Act for the same reasons that it violates all of the state antitrust laws enumerated in the Third Claim for Relief, *infra*.

128.    Beginning at least as early as 2008 and continuing through the present, the exact dates being unknown to Plaintiff, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, allocate markets and rig bids for, HDD suspension assemblies.

129.    For the purpose of forming and implementing the alleged combinations, trust, agreements, understandings and concert of action, Defendants did those things they conspired to do, including but not limited to the acts alleged above, including:

(a)    exchanging information on prices charged for HDD Suspension Assemblies;

(b)    agreeing to raise, fix, and maintain prices for HDD Suspension Assemblies;

(c)    raising, fixing, and maintaining prices for HDD Suspension Assemblies;

(d)    submitting rigged bids for HDD Suspension Assemblies;

(e)    allocating markets and/or customers for HDD Suspension Assemblies; and

(f)    selling HDD suspension assemblies into and throughout the United States, including California, at supracompetitive prices.

130.    The combination and conspiracy alleged herein has had the following effects, among others:

(a)    Price competition in the sale of HDD Suspension Assemblies has been restrained, suppressed and/or eliminated in California and throughout the United States;

(b)    Prices for HDD Suspension Assemblies sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supracompetitive levels in California and throughout the United States; and

(c)    Those who purchased HDD Suspension Assemblies indirectly from Defendants have been deprived of the benefit of free and open competition.

131.    As a direct and proximate result of the aforementioned illegal combination, trust, agreement, understanding and concert of action, Plaintiff and Class members have been injured in their business and property in that they paid more for HDD Suspension Assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct.

132.    As a result of Defendants' violations of Section 16720 of the California Business and Professions Code, Plaintiff seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**THIRD CLAIM FOR RELIEF**
**Violations of State Antitrust Laws**

133.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

134.   Plaintiff brings this omnibus claim against all Defendants on behalf of Repealer State Subclass members who made their relevant purchase(s) in Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

135.   For purposes of this omnibus claim, the law of the state in which each Repealer State Subclass member indirectly purchased one or more HDD Suspension Assemblies manufactured or sold by a Defendant, or by any co-conspirator or current or former subsidiary of a Defendant, applies to that transaction.

136.   Defendants' conduct in restraint of trade described herein violated the following laws:

        (a)   Ariz. Rev. Stat. § 44-1401 *et seq.*

        (b)   Cal. Bus. & Prof. Code § 16700 *et seq.*

        (c)   D.C. Code § 28-4501 *et seq.*

        (d)   Haw. Rev. Stat. § 480-4.

        (e)   Iowa Code § 553.1 *et seq.*

        (f)   Kan. Stat. Ann. § 50-101 *et seq.*

        (g)   Me. Rev. Stat. Ann. tit. 10, § 1101 *et seq.*

        (h)   Mich. Comp. Laws § 445.771 *et seq.*

        (i)   Minn. Stat. § 325D.49 *et seq.*

        (j)   Miss. Code Ann. § 75-21-1 *et seq.*

        (k)   Neb. Rev. Stat. § 59-801 *et seq.*

        (l)   Nev. Rev. Stat. § 598A.010 *et seq.*

        (m)   N.H. Rev. Stat. Ann. tit. XXXI, § 356:1 *et seq.*

        (n)   N.M. Stat. § 57-1-1 *et seq.*

| | | |
|---|---|---|
| (o) | N.Y. Gen. Bus. Law, § 340 *et seq.* |
| (p) | N.C. Gen. Stat. § 75-1 *et seq.* |
| (q) | N.D. Cent. Code § 51-08.1 *et seq.* |
| (r) | Or. Rev. Stat. § 646.705 *et seq.* |
| (s) | R.I. Gen. Laws § 6-36-1 *et seq.* |
| (t) | S.D. Codified Laws § 37-1-3.1 *et seq.* |
| (u) | Tenn. Code Ann. § 47-25-101 *et seq.* |
| (v) | Utah Code Ann. § 76-10-911 *et seq.* |
| (w) | W. Va. Code § 47-18-1 *et seq.* |
| (x) | Wis. Stat. § 133.01 *et seq.* |

137.    Plaintiff and Repealer Class Members who made their relevant purchases in the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and these Class members paid more for finished goods containing HDD Suspension Assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct in restraint of trade. This injury is of the type the antitrust laws of the above states were designed to prevent, and it is an injury that flows from what makes Defendants' conduct unlawful.

138.    Plaintiff and Repealer Class Members who made their relevant purchases in the above jurisdictions are accordingly entitled to damages, including statutory damages where applicable, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above laws.

139.    For purposes of this omnibus claim, the law of the state in which each Repealer State Subclass member indirectly purchased one or more HDD Suspension Assemblies manufactured or sold by a Defendant, or by any co-conspirator or current or former subsidiary of a Defendant, applies to that transaction.

1

**FOURTH CLAIM FOR RELIEF**
**Violations of State Unfair Competition Laws**

2      140.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

3    set forth herein.

4      141.     Plaintiff brings this omnibus claim against all Defendants on behalf of Repealer

5    State Subclass members who made their relevant purchase(s) in Arkansas, California, the District

6    of Columbia, Florida, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana,

7    Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota,

8    Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, and West

9    Virginia.

10      142.     For purposes of this omnibus claim, the law of the state in which each Repealer

11    State Subclass member indirectly purchased one or more HDD suspension assemblies

12    manufactured or sold by a Defendant, or by any co-conspirator or current or former subsidiary of a

13    Defendant, applies to that transaction.

14      143.     Based on the foregoing, Defendants engaged in unfair competition or unfair,

15    unconscionable or deceptive acts or practices in violation of the following laws:

16          (a)     Ark. Code Ann. § 4-88-101 *et seq.*

17          (b)     Cal. Bus. & Prof. Code § 17200 *et seq.*

18          (c)     D.C. Code § 28-3901 *et seq.*

19          (d)     Fla. Stat. § 501.201 *et seq.*

20          (e)     Haw. Rev. Stat. § 480-2.

21          (f)     Mass. G.L. c. 93A, § 1 *et seq.*

22          (g)     Mich. Comp. Laws Ann. § 445.901 *et seq.*

23          (h)     Minn. Stat. § 325F.68 *et seq.*

24          (i)     Mo. Rev. Stat. § 407.010 *et seq.*

25          (j)     Mont. Code, §§ 30-14-201 to -225.

26          (k)     Neb. Rev. Stat. § 59-1602 *et seq.*

27          (l)     Nev. Rev. Stat. § 598.0903 *et seq.*

28          (m)     N.H. Rev. Stat. Ann. tit. XXXI, § 358-A *et seq.*

1   (n)    N.M. Stat. § 57-12-1 *et seq.*

2   (o)    N.Y. Gen. Bus. Law § 349 *et seq.*

3   (p)    N.C. Gen. Stat. § 75-1.1 *et seq.*

4   (q)    N.D. Cent. Code § 51-10 *et seq.*

5   (r)    Or. Rev. Stat. § 646.605 *et seq.*

6   (s)    R.I. Gen. Laws § 6-13.1-1 *et seq.*

7   (t)    S.C. Code Ann. § 39-5-10 *et seq.*

8   (u)    S.D. Codified Laws § 37-24 *et seq.*

9   (v)    Utah Code Ann. § 13-11-1 *et seq.*

10  (w)    Vt. Stat. Ann. tit. 9, § 2453 *et seq.*

11  (x)    Va. Code Ann. § 59.1-196 *et seq.*

12  (y)    W. Va. Code § 46A-6-101 *et seq.*

13  144.    As a direct and proximate result of Defendants' aforementioned unfair competition

14  or unfair, unconscionable, or deceptive acts or practices, Plaintiff and Repealer State Subclass

15  members who made their relevant purchases in the above jurisdictions have suffered economic

16  losses and are entitled to appropriate relief, including but not limited to damages or restitution, as

17  well as reasonable attorneys' fees, in an amount to be proven at trial.

18  145.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, certain of the Defendants have or will

19  be served with a demand letter, or such service of a demand letter was unnecessary because the

20  Defendant does not maintain a place of business within the Commonwealth of Massachusetts or

21  does not keep assets within the Commonwealth.

22  **<u>PRAYER FOR RELIEF</u>**

23  WHEREFORE, Plaintiff, on behalf of himself and a class of all others similarly situated,

24  requests that the Court enter an order or judgment against Defendant, including the following:

25  a.    That the Court determine that this action may be maintained as a class action under

26  Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be certified as

27  a class representative, and Plaintiff's counsel be appointed as counsel for the Class;

28

1       b.     That Defendants' conduct alleged be adjudged and decreed to violate the laws

2  alleged in the Complaint;

3       c.     That Plaintiff and the Class recover damages, as provided by law, determined to

4  have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust

5  laws, and that judgment be entered against Defendant on behalf of Plaintiff and of the Class;

6       d.     That Plaintiff and the Class be awarded pre- and post-judgment interest;

7       e.     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees,

8  as provided by law; and

9       f.     All other relief to which Plaintiff and the Class may be entitled at law or in equity

10  as the case may require and the Court may deem just and proper.

11                       **<u>JURY TRIAL DEMANDED</u>**

12      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

13  of the claims asserted in this Complaint so triable.

14

15  Dated:  September 23, 2019          By: _s/ Patrice L. Bishop_____

16                               Patrice L. Bishop
                                **STULL, STULL & BRODY**

17                               9430 West Olympic Blvd., Suite 400
                               Beverly Hills, CA  90212

18                               Tel:     (310) 209-2468
                               Fax:    (310) 209-2087

19                               Email: service@ssbla.com

20                               Melissa R. Emert
                               **STULL, STULL & BRODY**

21                               6 East 45th Street
                               New York, NY  10017

22                               Tel:     (212) 687-7230
                               Fax:    (212) 490-2022

23                               Email: memert@ssbny.com

24                               ***Counsel for Plaintiff Ted Ingber***

25

26

27

28